**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

Wally Jones,

      Plaintiff,

              Civ. No. 11-2250 (RHK/JJK)
              **MEMORANDUM OPINION**
              **AND ORDER**

v.

Daniel Carpenter, Benistar 419
Plan Services, Inc., and Benistar
Admin Services, Inc.,

      Defendants.

Chad A. Snyder, Snyder Gislason Frasier LLC, Minneapolis, Minnesota, for Plaintiff.

Patrick H. O'Neill, Jr., Cara C. Passaro, O'Neill & Murphy, LLP, Saint Paul, Minnesota, for Defendant Daniel Carpenter.

Thomas A. Gilligan, Jr., Christopher G. Angell, Murnane Brandt, PA, Saint Paul, Minnesota, for Defendants Benistar 419 Plan Services, Inc., and Benistar Admin Services, Inc.

**INTRODUCTION**

  Plaintiff Wally Jones operates Construction Midwest, Inc. ("CMI"), a construction supply business in New Hope, Minnesota. In 1999, Defendant Daniel Carpenter and his companies—Defendants Benistar 419 Plan Services, Inc., and Benistar Admin Services, Inc. (collectively, "Benistar Defendants")—created and promoted the Benistar 419 Plan, a multiple-employer benefit plan through which employers can provide their employees with life insurance. Defendants' promotional materials represented that the Benistar 419

Plan met the strictures of Internal Revenue Code § 419A(f)(6), which meant that contributions to the plan would be tax deductible. Jones enrolled his company in the Benistar 419 Plan from 2000-2004. Several years later the IRS determined that Jones's contributions to the Benistar 419 Plan were not tax deductible, and Jones paid $94,279 in fees and interest in 2011. He then brought the instant suit to recover this amount, asserting that Defendants had defrauded him. Defendants now move for summary judgment, and for sanctions under Federal Rule of Civil Procedure 11. For the reasons that follow, the Court will grant the Motion for Summary Judgment and deny the Motion for Sanctions.

## BACKGROUND

I.   **Multiple-Employer Welfare Benefit Plans Under IRC § 419**

The instant case involves a multiple employer welfare benefit fund under IRC § 419 ("419 plan"). A 419 plan comprises assets set aside by employers to pay disability, medical, severance pay, or life-insurance benefits. Employer contributions into a 419 plan are tax deductible so long as certain criteria are met. See IRC § 419A(f)(6).

In 1995, the IRS issued Notice 95-34, an advisory opinion setting out the agency's view of what arrangements met the criteria in § 419A(f)(6). (Snyder Aff. Ex. A.) It also specified certain arrangements that failed to meet the criteria under § 419A(f)(6), one of which is if the plan maintains a separate accounting for each employer. (Id.) Two years later, the United States Tax Court agreed with the IRS that where a plan maintains separate accounts for each employer and an employee's ability to claim benefits is limited to the amount the employer has paid into the fund, that plan is experience rated

with respect to individual employers, and thus it does not meet the requirements of § 419A(f)(6). Booth v. Comm'r 108 T.C. 524, 571, 575 (1997).

## II. The Benistar 419 Plan

Carpenter is an attorney who specializes in tax and employee benefits. In 1997, he designed and implemented the Benistar 419 Plan and Trust ("the Benistar 419 Plan").[1] Using Notice 95-34 and Booth as guides, he created the Plan to be a multiple-employer welfare benefit trust pursuant to IRC §§ 419 and 419A(f)(6). (Carpenter Aff. ¶ 6; Snyder Aff. Ex. C, at 144.) He also wrote a short book entitled "A Professional's Guide to 419 Plans," which he distributed to tax and insurance professionals in hopes that they would recommend Benistar-administered plans and services to their clients. (Snyder Aff. Ex. B; Antonello Aff. ¶ 4.)

Promotional materials that Defendants distributed to tax and insurance professionals pointed out that their plan was different from the plan in Booth because it did not maintain separate accounts for each employer. These materials included a 1998 opinion letter from the law firm Edwards & Angell, LLP, which concluded that "contributions to the BENISTAR 419 Plan will be deductible . . . because [it] is an employee welfare benefit plan described in Section 419A(f)(6) of the [Internal Revenue] Code." (Snyder Aff. Ex. D at 2.) The Edwards & Angell letter also opined that the Benistar 419 Plan was different from the one in Booth because "the key defect in the plan

---

[1] The original Plan sponsor was Benistar Employer Services Trust Corp.; Benistar 419 Plan Services, Inc. became the sponsor in 2002. Carpenter was the chairman and CEO of both companies until he left Benistar Plan Services in 2004.

considered in Booth was that a separate account was kept for each employer." (Id. at 3.) According to the information that Defendants provided Edwards & Angell, the Benistar 419 Plan did not suffer from the same defect. (Id.)

In addition to sending out promotional materials, Carpenter personally promoted Benistar-administered plans. (Antonello Aff. ¶ 6.) He visited Minnesota on a number of occasions and did extensive business with Michael Antonello, CMI's financial advisor. (Id. ¶¶ 5-6.) According to Carpenter, a company's professional advisors had to feel "comfortable" with the plan before they would advise their clients to enroll. (Snyder Aff. Ex. C at 118-19.) In "99 percent of the cases the client's closest advisor, his accountant or CPA, would have been reviewing the [Edwards & Angell] opinion letter." (Id. at 119.)

### III. Jones Enrolls CMI in a 419 Plan

In early 1999, Antonello—Jones's life insurance agent—suggested to Jones the possibility of enrolling CMI in a 419 plan administered by the Benistar Defendants. (Antonello Aff. ¶¶ 2-3.) Both Antonello and Doug Waterman—Jones's accountant and tax advisor—reviewed the materials Defendants had provided, including the Edwards & Angell letter, and advised Jones that if Defendants' representations were correct, contributions to their 419 plan would be tax deductible. (Antonello Aff. ¶¶ 7-9; Waterman Aff. ¶ 1.) Neither Antonello nor Waterman had any reason to suspect that Defendants' 419 plan would maintain separate accounting for each employer, and neither investigated the issue beyond the materials furnished by Defendants. (Antonello Aff. ¶ 10; Waterman Aff. ¶ 4.)

On March 29, 1999, Jones signed an Adoption Agreement to enroll CMI in the BISYS Advantage Death Benefit Plan ("BISYS Advantage Plan"), a 419 plan which was administered by the Benistar Defendants. (Snyder Aff. Ex. F; id. Ex. G. at 70-71, 79.) According to the Adoption Agreement, CMI made annual contributions to this Plan in exchange for life insurance policies for Jones and three other CMI employees, from which the policy premiums were paid. (Doc. No. 34 Ex. E.) Sections 2.07 and 2.08 of the Adoption Agreement provided that upon "Termination of the Plan or Employer withdrawal from the Plan," the policies were to be distributed "to insured Plan members," who would then have the "[a]bility to purchase [the] policy from [BISYS Advantage Plan] for net cash surrender value." (Snyder Aff. Ex. F.)

In 2000, CMI's policies were transferred to the Benistar 419 Plan, which the Benistar Defendants sponsored and administered. CMI remained enrolled in this plan for several years. (Antonello Aff. ¶ 12.) Throughout this time, Defendants sent newsletters and bulletins to the plan participants to keep them updated on regulatory changes and how those changes might affect the Benistar 419 Plan, including an updated Edwards & Angell opinion letter in October 2003. (Snyder Aff. Exs. H-L.) In a January 22, 2004 letter to participating employers, Defendants addressed how changes in regulations affected the Benistar 419 Plan. (Doc. No. 34 Ex. H.) The new regulations made it "dangerous for a number of reasons" to distribute a policy to a covered employee if the employer terminated its participation in the plan, and Defendants would no longer offer that option to plan participants to minimize the risk. (Id. at 5.) Each of these letters re-

5

attested that contributions to the Benistar 419 Plan would be tax-deductible because the Plan was not substantially similar to the 419 plans addressed in Notice 95-34 or Booth.

## IV. Jones and CMI Leave the Benistar 419 Plan

Jones, acting on advice from Antonello, decided to withdraw CMI from the Benistar 419 Plan. On December 28, 2004, he signed a Certificate of Resolution to move CMI's policies in the Benistar 419 Plan to the Grist Mill Trust Welfare Benefit Plan ("Grist Mill Plan"). (Snyder Aff. Ex. M.) He also executed the Grist Mill Plan Termination and Policy Transfer Release form to withdraw his policy from the Grist Mill Plan. (Id. Ex. O.) A provision in this form reads: "Please allow 45 days for processing." (Id.) Jones also sent a letter to Grist Mill directing that the policy be transferred to his ownership, and included a $1,000 check and a signed Change of Ownership form for the policy. (Id. Exs. P, Q.)

Grist Mill sent CMI a letter on January 25, 2005, advising that each participant had to release the existing trust before it would transfer the policies from the Benistar 419 Plan to the Grist Mill Plan. (Doc. No. 34 Ex. K.) Six days later, Jones executed a General Release, which provided

> [I]n consideration of obtaining ownership of an insurance policy issued on the life of the Participant, the receipt of which is hereby acknowledged, Releasor does hereby release remise and forever discharge the **BENISTAR 419 PLAN & TRUST, BENISTAR 419 PLAN SERVICES, INC., BENISTAR EMPLOYER SERVICES TRUST CORPORATION, BENISTAR ADMIN SERRIVCES, INC.,** and their respective heirs executors, administrators, assigns, affiliates, successors, predecessors, parents, subsidiaries, officers, stockholders, directors, partners, members, trustees, beneficiaries, employees, attorneys, accountants, representatives and agents, past and present . . . from any and all matters, facts, events, conditions, allegations, actions, suits, proceedings, charges, complaints,

6

> claims, demands, damages, costs, agreements, contracts, promises, liabilities, obligations, debts, losses, expenses, fees, court costs, attorneys' fees and expenses of any kind whatever, whether presently known or unknown, under the laws of any jurisdiction, which against any of the Releasees, Releasor ever had, now has or hereafter can, shall or may have, for, upon, or by reason of any mater, cause or thing whatsoever (including said insurance policy and Participant's involvement with the **BENISTAR 419 PLAN & TRUST**) from the beginning of the world to the date of this Release.

(Id. Ex. I.) Jones signed this release on January 31, 2005, and the policies were transferred to the Grist Mill Trust on April 11, 2005. (Gilligan Aff. Exs. I, J.)

## V.  IRS Investigation & Curcio v. Commissioner

The IRS contacted CMI in December 2006, asserting that CMI's contributions to the Benistar 419 Plan were not deductible under § 419A(f)(6), and commenced an investigation. (Snyder Aff. Ex. S.) The scope of the investigation eventually expanded to include Jones's individual tax liability for tax years 2003, 2004, and 2005. (Id. Ex. T; Jones Aff. ¶ 7.) Jones appealed the IRS's determination of his liability for the tax years in question in light of its conclusion that the Benistar 419 Plan did not satisfy the requirements of § 419A(f)(6). (Doc. No. 34 Ex. D.) After several years of investigation, the IRS determined that the contributions to the Benistar 419 Plan were non-deductible deferred compensation and issued Jones a notice of deficiency on July 17, 2009. (Id. Ex. P.)

In 2010, the Tax Court issued its decision in Curcio v. Commissioner, T.C. Memo 2010-115, 2010 WL 2134321 (T.C. 2010). Curcio consolidated "three groups of test cases to resolve a number of disputes regarding companies participating in the Benistar § 419 Plan & Trust." Id. at *2. Carpenter testified over the course of two days as a

witness for the taxpayers in Curcio. (See Snyder Aff. Ex. C.) During his testimony, Carpenter stated that Defendants kept a contribution summary that listed details of each employer and the historical account contributions and premium payments, segregated those records, and ensured that plan participants were current with their contributions before paying the policy premiums for that employer. (Id. Ex. C at 71, 260-61.) In the end, the Tax Court found that "although contributions to the plan were deposited in one account, [the Benistar 419 Plan] maintained spreadsheets that allocated every contribution to an employer and a corresponding underlying policy." Curcio, 2010 WL 2134321, at *49. Although the Tax Court declined to expressly decide the question, it found all the necessary facts that would support a determination that the Benistar 419 Plan did not meet the strictures of § 419A(f)(6). In light of this, Jones and the IRS reached a settlement shortly after Curcio was decided. He and his wife paid the taxes that the IRS determined he owed and an additional $94,279 in penalties and interest. (Jones Aff. ¶ 7.)

     Jones commenced the instant action in the Hennepin County District Court on July 14, 2011, asserting claims of intentional misrepresentation and violations of the Minnesota Consumer Fraud Act, Minn. Stat. § 325F.69, and the Minnesota False Statement in Advertising Act, Minn. Stat. § 325F.67. Defendants removed the action to this Court, and presently before the Court are Defendants' Motions for Sanctions (Doc. No. 13) and Summary Judgment (Docs. No. 19, 21). The issues have been fully briefed, and the Court heard oral argument on July 25, 2012. The Motions are ripe for disposition.

## STANDARD OF DECISION[2]

Summary judgment is proper if, drawing all reasonable inferences in favor of the nonmoving party, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). The moving party bears the burden of showing that the material facts in the case are undisputed. Id. at 322; Whisenhunt v. Sw. Bell Tel., 573 F.3d 565, 568 (8th Cir. 2009). The Court must view the evidence, and the inferences that may be reasonably drawn from it, in the light most favorable to the nonmoving party. Weitz Co., LLC v. Lloyd's of London, 574 F.3d 885, 892 (8th Cir. 2009); Carraher v. Target Corp., 503 F.3d 714, 716 (8th Cir. 2007). The nonmoving party may not rest on mere allegations or denials, but must show through the presentation of admissible evidence that specific facts exist creating a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); Wingate v. Gage Cnty. Sch. Dist., No. 34, 528 F.3d 1074, 1078-79 (8th Cir. 2008).

## ANALYSIS

### I.  Subject-Matter Jurisdiction

Defendants argue that this Court lacks subject-matter jurisdiction[3] over this dispute because the parties agreed that any disputes were subject to mandatory

---

[2] For the purpose of clarity, the Court will address the appropriate standard for Defendants' Motion for Sanctions below.

[3] Defendants also argue that the Court lacks personal jurisdiction, but this argument fails. The Benistar Defendants direct-mailed promotional materials to Minnesota and Carpenter personally visited the state to promote the plan, all of which amount to sufficient contacts with the state

9

arbitration. Specifically, the Certificate of Coverage that CMI executed provides that "all unresolved disputes or claims under the [Benistar 419 Plan] will be settled by arbitration in New York, New York." (Gilligan Aff. Ex. G at 3.) Notably, Defendants have not moved to compel arbitration, but rather argue that in light of the arbitration provision, summary judgment in their favor is appropriate.

As an initial matter, the mere existence of an arbitration clause does not deprive this Court of subject-matter jurisdiction. Koes v. Advanced Design, Inc., 636 N.W.2d 353, 362 (Minn. Ct. App. 2001). Indeed, it "no more deprives the court of jurisdiction than a defense based on any other contractual forum-selection clause would." Gabbanelli Accordions & Imps., L.L.C. v. Ditta Gabbanelli Ubaldo Di Elio Gabbanelli, 575 F.3d 693, 695 (7th Cir. 2009). A party to an arbitration agreement always has the option to waive the agreement by filing a lawsuit, and the "defendant join[s] in the repudiation by answering to the merits without a demand for arbitration or a motion to stay the suit until arbitration could be had." Anderson v. Twin City Rapid Transit Co., 84 N.W.2d 593, 602 (Minn. 1957).

Jones argues that the Defendants have waived their right to arbitration. A party may be found to have waived its right to arbitration if it (1) knew of an existing right to arbitration, (2) acted inconsistently with that right, and (3) prejudiced the other party by those inconsistent acts. Lewallen v. Green Tree Servicing, L.L.C., 487 F.3d 1085, 1090 (8th Cir. 2007). A party acts inconsistently with a right to arbitration when it

---

such that they could reasonably anticipate being haled into court in Minnesota. See Pecoraro v. Sky Ranch for Boys, Inc., 340 F.3d 558, 562 (8th Cir. 2003) (citing Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475 (1985)).

"substantially invokes the litigation machinery before asserting its arbitration right." Lewallen, 487 F.3d at 1090 (citation and quotation omitted). If it wants to safeguard its right to arbitration, it must "do all it could reasonably [be] expected to do to make the earliest feasible determination of whether to proceed judicially or by arbitration." Id. (quoting Cabinetree of Wis., Inc. v. Kraftmaid Cabinetry, Inc., 50 F.3d 388, 391 (7th Cir. 1995)). Here, Defendants chose to remove the actions from Hennepin County District Court to this Court, answer the complaint, engage in months of discovery, and file and brief two lengthy motions, including one for summary judgment. At any point in the proceedings—and especially before engaging in months of discovery—they could have requested or moved to compel arbitration. See Stifel, Nicolaus & Co. Inc. v. Freeman, 924 F.2d 157, 158 (8th Cir. 1991) (concluding that a six-month delay in moving to compel arbitration and engaging in discovery on arbitrable claims are inconsistent with the right to arbitrate). They have not once demanded arbitration or moved to compel it, and instead they engaged Jones's suit on the merits. "Almost uniformly such conduct . . . constitutes an abandonment or waiver of the right to arbitrate and a consent to the submission of the controversy to the courts." Anderson, 84 N.W.2d at 602.

Even where a party acts inconsistently with a right to arbitrate, it has not waived the right unless its actions prejudiced the opposing party. Prejudice results when the "parties use discovery not available in arbitration, when they litigate substantial issues on the merits, or when compelling arbitration would require a duplication of efforts." Kelly v. Golden, 352 F.3d 344, 349 (8th Cir. 2003). Defendants brought the instant Motions, encouraging the Court to resolve the entire dispute in their favor. Jones has incurred the

11

expense of opposing the Motions, and if the Court were to send the claims to arbitration, he would be required to extensively duplicate his efforts. Accordingly, the Court determines that the Benistar Defendants have waived their right to arbitrate and the Court has subject-matter jurisdiction over the instant dispute.

**II.     Waiver and Release**

Having found jurisdiction exists, the Court will next assess whether Plaintiff's recovery is barred by the January 2005 Waiver and Release. Releases are presumed valid because courts encourage settlements of disputes. Sorenson v. Coast-to-Coast Stores (Central Org.), Inc., 353 N.W.2d 666, 669 (Minn. Ct. App. 1984). A release is invalid, however, if the executing party did not receive sufficient consideration. Norris v. Cohen, 27 N.W.2d 277, 281 (Minn. 1947). Jones argues that the release was not supported by valid consideration, and even if it was, that Defendants' wrongful concealment nullifies the release.

With respect to his consideration argument, Jones takes the position that the Adoption Agreement that CMI entered into with the BISYS Advantage Plan controlled its relationship with the Benistar 419 Plan. The Adoption Agreement provides that insured Plan members had the ability to purchase the policy from the plan. Jones executed the policy transfer request form on December 28, 2004. At that point, he argues, Benistar had a legal obligation to transfer the policy, and therefore the transfer could not be consideration for Jones's execution of the release.

This argument, however, is directly contradicted by the clear wording on the transfer request form, which provides, "Please allow 45 days for processing." (Snyder

Aff. Ex. O.)   Moreover, Defendants informed participating employers in the January 22, 2004 letter that Benistar would no longer distribute a policy immediately upon termination from the plan.  Accordingly, Jones's argument that the release lacked consideration because Benistar had a legal obligation to transfer the policy fails.  Transferring the policy to the Grist Mill Trust, which Defendants had no obligation to do, constituted valid consideration for Jones's signing the January 2005 release.

Finding valid consideration for the release, however, does not end the Court's inquiry.  Wrongful concealment or other inequitable conduct that contributes to a party's unilateral mistake could also void the release.  Schmitt-Norton Ford, Inc. v. Ford Motor Co., 524 F. Supp. 1099, 1102-03 (D. Minn. 1981) (MacLaughlin, J.); Norris, 27 N.W.2d at 281.  Defendants argue that if any concealment occurred, it did not touch execution of the release, and therefore the release is valid.  Fraud or misrepresentation "must touch execution of the release" to undermine the release's validity, Sorensen, 353 N.W.2d at 670, and Jones does not argue this point.  Wrongful concealment, however, is different from fraud or misrepresentation, and courts evaluate it separately.  Id.; see also Benincasa v. Lafayette Life Ins. Co., Civ. No. 10-959, 2011 WL 5967300 (D. Minn. Nov. 29, 2011) (Nelson, J.).  Jones argues that Defendants' failure to disclose that the Benistar 419 Plan maintained separate accountings for each employer while actively representing that it did not was wrongful concealment that justifies voiding the release.

Wrongful concealment can void a release when "the defendant wrongfully concealed facts from the plaintiff or induced the mistake in some other way." Sorenson, 353 N.W.2d at 670 (citing Norris, 27 N.W.2d 277).  In Norris, the plaintiffs ran a general

13

merchandising operation, selling goods to retailers in the region. They entered into a contract with the defendant, who agreed to install and operate a shoe department for the plaintiffs. The defendant took some shoes from the plaintiffs' stock, sold them, and kept the proceeds for himself. When the parties later executed a release, the plaintiffs did not know that the defendant—"in whom they had imposed trust"—had taken their merchandise and sold it on the side. 27 N.W.2d at 281. The court found the release invalid because by knowing that the plaintiffs executed the release on the presumption that he had not stolen their merchandise, the defendant concealed a fact "material to the transaction and peculiarly within his own knowledge." Id. (citing Thomas v. Murphy, 91 N.W. 1097 (Minn. 1902)). The Minnesota Supreme Court held that a release can be avoided for unilateral mistake when "such mistake was caused by the inequitable conduct of, or when known and wrongfully acted upon or taken advantage of by, the other contracting party." Id.

Unlike Norris, nothing in the record shows that Defendants' representations to Jones were wrongful. Black's Law Dictionary defines wrongful as "[i]njurious, heedless, unjust, reckless, unfair; [implying] the infringement of some right, and [possibly resulting] from disobedience to lawful authority." Black's Law Dictionary 1612 (6th ed. 1990). Defendants parsed Notice 95-34 and Booth, and created a welfare benefit plan that, in their estimation, met the strictures of § 419A(f)(6). They promoted the Benistar 419 Plan as following the roadmap laid out by the IRS and the Tax Court, and provided agents with the Edwards & Angell letter opining that contributions would be tax deductible because, *inter alia*, they did not keep separate accounts for each plan

14

participant. Even if the Tax Court determined years later in Curcio that the Benistar 419 Plan kept separate accounts, no evidence supports the proposition that Defendants *knew* their actions amounted to keeping separate accounts when they were promoting their plan. That the IRS and Tax Court disagreed with Defendants' analysis does not make their earlier representations wrongful in the same way as the defendant's misrepresentation in Norris. Indeed, how the Tax Court or the IRS would interpret the Benistar 419 Plan's structure with respect to the § 419A(f)(6) requirements was not information "peculiarly within [Defendants'] knowledge," Norris, 27 N.W.2d at 281, and therefore wrongful concealment does not invalidate the January 2005 release.

In exchange for Defendants transferring the policy to Grist Mill, Jones executed a release of any and all claims he might have against them. The release was clearly-worded, Jones was not misled about the nature of what he was signing, and he received consideration for his execution of the release. Defendants did not fraudulently misrepresent or wrongfully conceal any fact that requires voiding the release. The Court therefore determines that the January 2005 Waiver and Release bars the present action, and the Complaint will be dismissed.

### III. Sanctions

In a separate motion, Defendants request the Court impose sanctions under Federal Rule of Civil Procedure 11 because Jones's claims are baseless, waived, time-barred, and required to be resolved by arbitration. As the foregoing should demonstrate, the Court finds that Jones's suit, while ultimately unsuccessful, was neither frivolous nor baseless. Although Jones did sign a release, he made non-frivolous arguments that would have

rendered it inoperative. He further made compelling and good-faith arguments that the Court ultimately did not reach. Although Jones's arguments do not survive close scrutiny, it does not necessarily follow that they were frivolous and unfounded. See, e.g., Eastway Constr. Corp. v. City of N.Y., 637 F. Supp. 558, 575 (S.D.N.Y. 1986). An arguable basis for the suit existed, and an attorney making a reasonable inquiry could determine that Jones's claims had legal and factual support. Therefore, Rule 11 sanctions are unwarranted.

In his opposition brief, Jones requests an award of reasonable expenses, including attorney's fees, incurred in opposing the Motion for Sanctions. (Mem. in Opp'n at 41.) Such an award is unwarranted here. The issues raised in Defendants' Motion for Sanctions closely track those raised in their Motions for Summary Judgment. Jones addressed both Motions efficiently and effectively in one memorandum; in his 41-page memorandum, only three pages addressed the Motion for Sanctions, most of which focused on his fee request. The Court cannot say, however, that Defendants' Motion was "destined to fail." Eastway Const. Corp. v. City of New York, 762 F.2d 243, 254 (2d Cir. 1985). In light of Rule 11's purpose of deterrence rather than reimbursement, Pavelic & LeFlore v. Marvel Entm't, 493 U.S. 120, 126 (1989), and the Eighth Circuit's stated preference for the least severe sanction necessary to achieve the sanction's objective, see Kirk Capital Corp. v. Bailey, 16 F.3d 1485, 1490 (8th Cir. 1994), the Court will deny Jones's request.

## CONCLUSION

Based on the foregoing, and all the files and records, **IT IS ORDERED** that Defendants' Motions for Sanctions (Doc. Nos. 13, 26) are **DENIED**, and Defendants' Motions for Summary Judgment (Doc. Nos. 19, 21) are **GRANTED.** The Complaint is **DISMISSED WITH PREJUDICE.**

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Date:  August 15, 2012

s/Richard H. Kyle
RICHARD H. KYLE
United States District Judge